UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

David R. Burns,

                          Plaintiff,          CV-08-3763 (CPS)

     - against -                              MEMORANDUM
                                              OPINION AND ORDER
The Marley Company Pension Plan for
Hourly Employees at Stockton, California,
The Administrative Committee of Marley
Company Pension Plan for Hourly Employees
at Stockton, California, SPX Corporation,
SPX Retirement and Welfare Plan
Administrative Committee, SPX Pension
Service, and JP Morgan Chase Bank, N.A.,
Benefits Payment Services,

                          Defendants.

-----------------------------------------X
SIFTON, Senior Judge.

     Plaintiff David R. Burns commenced this action on September

16, 2008, against the Marley Company Pension Plan for Hourly

Employees at Stockton, California ("the Plan"), the

Administrative Committee of the Marley Plan, the SPX Corporation

("SPX"), the SPX Retirement and Welfare Plan Administrative

Committee ("SPX Administrative Committee"), the SPX Pension

Service, and JP Morgan Chase Bank, N.A., Benefits Payment

Services ("JP Morgan").  Plaintiff claims that defendants: (1)

breached the duty of absolute loyalty they owed to plaintiff as

his fiduciaries under § 404 of the Employee Retirement Income

Security Program ("ERISA"), 29 U.S.C. § 1104(a)(1), by failing to

provide plaintiff with accurate information about the Plan; and

(2) failed to furnish plaintiff with a summary plan description

in violation of Section 104(b)(1) of ERISA, 29 U.S.C. §
1024(b)(1).[1]  Plaintiff seeks equitable relief, including: (a)
directing the Plan to determine whether Plaintiff is totally and
permanently disabled; and (b) if the plan determines that he is
totally and permanently disabled, making a limited and temporary
reformation of the Plan for the sole purpose of permitting
Plaintiff to be paid benefits based on his nine years of earned
credit.  By Order dated April 30, 2009, the undersigned granted
defendants' December 23, 2008 motion for Judgment on the
Pleadings pursuant to Rule 12(c), and granted plaintiff leave to
replead his claims in an amended complaint to be filed within 30
days of the date of the memorandum opinion.  *See Burns v. Marley
Co. Pension Plan for Hourly Employees at Stockton, Cal.*, No.
08-CV-3763 (CPS), 2009 WL 1193474 (E.D.N.Y. Apr. 30, 2009).
Plaintiff's Amended Complaint was filed on June 1, 2009.[2]
Presently before this Court is defendants' motion to dismiss the
Amended Complaint pursuant to Federal Rule of Civil Procedure
12(b)(6).  For the reasons set forth below, defendants' motion is
granted.

---

[1]  29 U.S.C. § 1024(b)(1) provides that: "[t]he administrator shall
furnish to each participant, and each beneficiary receiving benefits under the
plan, a copy of the summary plan description, and all modifications and
changes referred to in section 1022(a)(1) of this title [] within 90 days
after he becomes a participant, or (in the case of a beneficiary) within 90
days after he first receives benefits."

[2]  Because the last day of the 30 day period fell on Saturday, May 30,
2009, the Amended Complaint was timely filed on June 1, 2009. *See* Fed. R. Civ.
Pro. 6(a)(3).

**BACKGROUND**

The following facts are drawn from the Amended Complaint and the exhibits attached thereto, and are assumed to be true for the purposes of this motion.

Plaintiff is a resident of Nevada, and a participant in the defendant Plan. Am. Compl. ¶ 3. On September 27, 1994, he was hired by the Marley Company (renamed Marley Cooling Technologies in 2005)("Marley") to work at its Stockton factory, where he continued to work until July 26, 2002. *Id.* ¶¶ 7, 10.

The defendant Plan was created by Marley. *Id.* ¶ 4. The Plan's 1993 Summary Plan Description ("SPD") names the Marley as the Plan administrator. *Id.* The Marley Company chooses the Plan Administrative Committee, which is endowed with discretionary authority to construe the terms of the Plan and to determine eligibility for benefits, pursuant to section 9.2 of the Plan. *Id.* ¶¶ 4-5; *see also id.* Ex. A (copy of 1993 Summary Plan Description) at 8.

Defendant JP Morgan is named as the Plan's trustee in the Summary Plan Description effective July 26, 2002. *Id.* ¶ 6. JP Morgan, as trustee, is the successor to Deutsche Bank, which on or about June 4, 1999, acquired the Bankers Trust Company, which had been named trustee in the Plan's 1993 Summary Plan Description. *Id.*

Defendant SPX is the successor to Marley. *Id.* ¶ 4. SPX is

a publicly owned company whose shares are traded on the New York Stock Exchange, with its principal office in Charlotte, North Carolina. *Id* ¶ 5. According to the Plan's Summary Plan Description, effective July 26, 2002, defendant SPX Administrative Committee is the successor to defendant Marley Company Administrative Committee. *Id.*

Plaintiff worked at the Stockton factory from September 27, 1994, to July 26, 2002. *Id.* ¶¶ 7-10. In 2001, soon after SPX acquired Marley, the company convened a "safety luncheon." *Id.* ¶ 15. At the luncheon, food was served, and workers were provided with small gifts as an award for the extended period in which there were no reports of accidents or claims for Workers' Compensation benefits. *Id.* ¶ 16. The luncheon was presided over by the highest officers of SPX with direct responsibility for the operation of the factory: Anthony Calestini, the plant manager, and Robert Griffith, its superintendent. *Id.* ¶ 17. At the meeting, plaintiff and the other workers present were handed their paycheck and a statement concerning their benefits. *Id.* 18. Plaintiff received a document on defendant SPX's letterhead captioned "UDI Master Pension Plan for Hourly Employees: Marley Cooling Tower Stockton Plant," and sub-captioned "Statement of Estimated Benefits as of December 31, 2001" (the "Pension Statement"). *Id.* ¶ 19. According to the Pension Statement, plaintiff was estimated to have 8.0833 years of "credited

service" and 7 years of "vesting service"[3] as of December 31, 2001. *Id. ¶ 20; see also id.* Ex. C (copy of Pension Statement). The Pension Statement further explains that "[t]he data shown on this statement reflects information currently on file and hours earned through December 31, 2001. **When you retire or terminate employment, your benefit is calculated based on your actual Years of Credited Service and may be higher or lower than the amount shown.**" *Id.* Ex. C (emphasis in original).

Plaintiff alleges that notwithstanding the limiting language in the document, he believed that SPX had arrived at the number 8.0833 "by using a sophisticated computer designed to make not estimates, but highly accurate calculations," and believed the figure was an accurate reflection of plaintiff's pension credit. *Id.* at 21.

At a May 17, 2002 meeting convened by his employer,

---

[3] According to the Plan, one "credit" is awarded for every plan year during which an employee completes at least 1,500 Hours of Service [as defined], with fractional credit afforded for any portion of a year in which an employee completes at least 1000, but less than 1,500 Hours of Service. Am. Compl. Ex. B (Plan, at II(2.1)(12)).

The Pension Statement explains that "vesting service" years are used to determine "vesting status":

> **Vesting Status** refers to your right to receive benefits from the Plan. If your Vesting Status is "Vested," you have already earned the right to receive benefits from the Plan. If your Vesting Status is "Not Vested," you will become fully vested when you have earned a total of five years of Vesting Service. The Vesting Service, which you have earned as of December 31, 2001, is shown in this statement. You will earn one year of Vesting Service for each calendar year in which you work at least 1,000 hours.

Compl. Ex. C (emphasis in original).

plaintiff was informed that the Stockton factory was being
closed.  Compl. ¶ 26.  During the meeting, employees were
informed of a Special Separation Plan ("SSP") pursuant to which
workers who resigned and agreed to waive certain rights would be
provided with additional benefits either in the form of a single
payment or an annuity.  In the following months, company
representatives assured employees that if they did not choose to
accept the SSP, they would be permitted to transfer to another
SPX-affiliated facility.  *Id.* ¶ 27.  These assurances were made,
in plaintiff's presence: (1) during a meeting on the Stockton
plant closure; (2) during contract negotiations with union
leaders; and (3) at a dinner held at the conclusion of
negotiations after the union voted to accept the terms of the
contract for plant closure.  *Id.*

During the meetings concerning the plant closure, company
representatives told employees that terminated employees would be
given full pension credit for 2002,[4] despite the plant closure.
*Id.* ¶ 28.  Plaintiff alleges that he knew that, pursuant to the
collective bargaining agreement between Marley and plaintiff's
union, Millmen's Local #1618 ("CBA"), he would be provided 18

_____

[4] Although the Amended Complaint states that "Holliday [Marley's
Director of Labor Relations] also explained that employees would be given full
pension credit for 2002, despite the closure," plaintiff appears to concede
that company representatives promised pension credit through the date *on which
the plant closed,* not the end of the 2002 calendar year.  *See* Pl. Br. at 3
(noting that the December 22, 2005 letter from SPX granting plaintiff pension
credit "for the seven months of work he actually performed prior to the
plant's closure in 2002" was an accurate calculation).

months additional pension credit if he became disabled "due to industrial injury." *Id.* *See also* Ex. D (copy of CBA). As a result, plaintiff alleges that he believed that he would have sufficient credits to qualify for a total and permanent disability pension in the event that an industrial injury prevented him from continuing to work. *Id.* ¶ 29.

On June 12, 2002, while working at SPX's water treatment plant, plaintiff slipped and fell into a contaminated sludge pit. *Id.* ¶ 30. As a consequence of this accident, plaintiff injured his right wrist, arm and hand, and his knee (including his anterior cruciate ligament). *Id.* Plaintiff was able to return to work, but alleges that he continued to suffer impaired functioning and pain from his injuries. During the approximately six weeks between the accident and the plant's closure, plaintiff had several conversations with two upper-level managers about the pain and limitations caused by the accident. *Id.* ¶ 33. During that same period, SPX reduced the number of workers at the plant to five men, including plaintiff, who comprised the machine maintenance staff. Plaintiff alleges that the small number of remaining workers made plaintiff more visible to the remaining company officials and provided more opportunities for them to observe plaintiff and speak to him. *Id.* ¶ 34.

According to the Plan's 1993 Summary Plan Description, participants in the Plan are eligible for a disability pension if

they "become permanently and totally disabled,"[5] and have "at
least 10 years of service at the time [they] become disabled."
Compl. ¶ 37; *see also id.* Ex. A (copy of SPD) at 5. "Years of
Credited Service" is defined as follows: "You earn a year of
credited service for each calendar year during which you complete
1,500 hours of service. Also, you receive a partial year of
credited service if you complete at least 1,000 but less than
1,500 hours of service in a calendar year." *Id.* Ex. A at 3.
Plaintiff alleges that because he believed he had sufficient
credits for a disability retirement pension, he declined to
pursue the opportunity to transfer to another SPX-affiliated
facility. *Id.* ¶ 37. Instead, plaintiff agreed to sever his
employment and accept the SSP, and his employment was terminated
on July 26, 2002. *Id.* ¶¶ 37, 39.

Following the closure of the Stockton plant, plaintiff
accepted employment at another company, Cottage Bakery,
performing duties similar to those he had at the Stockton Plant.
Plaintiff alleges that his pain and limitations persisted and
worsened, eventually preventing him from continuing to work. *Id.*

---

[5] "Permanently and totally disabled" was defined to mean:

[A]s a result of bodily injury or disease, you are permanently,
continuously and wholly prevented for life from engaging in any
occupation and performing any work for compensation. You will also be
considered disabled if you totally and irrevocably lose: sight of both
eyes, use of both hands, use of both feet, use of one hand and one foot.

Compl. Ex. A at 5.

¶¶ 43, 46.  Defendant underwent several surgeries but alleges
that his condition failed to improve.  *Id.* ¶¶ 42, 45.  He applied
for Social Security Disability benefits in early 2005, and they
were granted that same year, finding him to have been disabled
since he stopped working on or about January 13, 2004.[6]  *Id.* ¶
46.

By letter dated August 10, 2005, plaintiff asked the Plan to
grant him a disability retirement benefit retroactive to January
13, 2004.  *Id.* ¶ 47.  On September 19, 2005, SPX sent plaintiff a
letter ("the Initial Denial Letter") informing him that his claim
had been rejected.  *Id*. ¶ 48.  The Initial Denial Letter stated
that plaintiff had 8.0833 years of credited service as of July
26, 2002.  *Id.; see also id.* Ex. F (copy of Initial Denial
Letter).  The letter made no reference to the additional months
of credit plaintiff believed he had been promised.  *Id.*

On November 1, 2005, plaintiff appealed the denial.  *Id.*
¶ 50.  By letter dated December 22, 2005 (the "Second Denial
Letter"), the SPX Appeals Subcommittee ("the Subcommittee")
informed plaintiff that the denial of his claim had been
affirmed.  *Id.* ¶ 51.  Unlike the Initial Denial Letter, the
Second Denial Letter confirmed that plaintiff was credited with 7
months of service during 2002 through the date of the plant

---

[6] The Amended Complaint does not state a specific date on which Social
Security disability benefits were granted.

closure on July 26, 2002, and an additional 18 months of post-termination service, as previously promised. *Id.* ¶ 51; *see also id*. Ex. G (copy of Second Denial Letter). However, in the Second Denial Letter, the Subcommittee informed plaintiff that he did not have 8.0833 years of credited service through the end of 2001, as was reflected in both the Pension Statement and the Initial Denial Letter; rather, plaintiff had 7 years of credited service as of December 31, 2001. *Id.* With the additional credit for 25 months, the Second Denial Letter found that plaintiff had earned nine years of credited service -- one year short of the ten years of credited service required for permanent disability benefits. *Id.*

## DISCUSSION

## I. <u>Standard for a Motion to Dismiss</u>

In considering a motion pursuant to Rule 12(b)(6), the court "construes the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal citations and quotations omitted), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). Dismissal is warranted where a plaintiff fails to plead sufficient factual allegations "to state

a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of the cause of action" do not suffice; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950.

## II. <u>Breach of Fiduciary Duty under ERISA</u>

Plaintiff alleges that by failing to provide plaintiff with an accurate benefit statement or summary plan description, defendants breached the duty of absolute loyalty that they owed to plaintiff as fiduciaries under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1).[7]  Section 502(a)(3) of ERISA authorizes a

---

[7] Section 404(a)(1) provides, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

> (A) for the exclusive purpose of:

> (i) providing benefits to participants and their beneficiaries . . .
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . .
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

suit in equity for breach of fiduciary duty.  29 U.S.C. § 1132(a)(3)[8]; *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir. 2008).

"To establish a breach of fiduciary duty based on alleged misrepresentations about coverage under an ERISA plan, Plaintiff must show that (1) Defendants were acting in a fiduciary capacity and that (2) they made a material misrepresentation or omission (3) on which Plaintiff relied to her detriment." *Burns v. Marley Co. Pension Plan for Hourly Employees at Stockton, Cal.*, No. 08-CV-3763 (CPS), 2009 WL 1193474, at *5 (E.D.N.Y. Apr. 30, 2009) (*citing Bell v. Pfizer Inc.*, 499 F. Supp. 2d 404, 410 (S.D.N.Y. 2007)).

In my April 30, 2009 Order dismissing plaintiff's Complaint, I found that defendants' having allegedly provided an inaccurate statement to plaintiff which overstated his pension credit by one year did not suffice to state a Section 502(a)(3) claim for breach of fiduciary duty because, even assuming defendants were acting in a fiduciary capacity, (1) defendant did not make a material misrepresentation, and (2) plaintiff did not reasonably

---

29 U.S.C. § 1104(a)(1).

[8] Section 502(a)(3) authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]"  29 U.S.C. § 1132(a)(3).

rely on such a misstatement to his detriment.  *Id.*

In plaintiff's Amended Complaint, he amplifies his original claims by supplying additional context regarding the environment in which the allegedly misleading Statement was given.  Plaintiff contends that his reliance on the document providing an allegedly erroneous estimate of his pension credits was reasonable given the entirety of the circumstances, including the fact that (1) the document was given during the course of a significant event, a safety lunch attended by high level management; and (2) at no other time during his employment did plaintiff receive a benefits statement or estimate of his pension credits.  Plaintiff also contends that SPX's failure to affirmatively correct his misapprehension was a violation of its duty of loyalty because SPX knew that plaintiff had a workplace accident on June 12, 2002, that plaintiff continued to suffer pain and limitations until his termination, and that he might act in reliance on a statement that purported to estimate his eligibility for pension benefits.

Notwithstanding plaintiff's having supplied additional "context" to the claims made in the Amended Complaint, he has failed to plead that defendants made a material misrepresentation or omission, or that plaintiff reasonably relied on such a

misrepresentation or omission to his detriment.[9]


A.   *Material Misrepresentation*

A misrepresentation is "material" if there is a substantial likelihood it "would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Id.* at 411 (citing *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 192 (2d Cir. 2001)).  In general, a benefit statement explicitly labeled as an estimate will not constitute a material misrepresentation because reliance on such a statement would not be reasonable.  *See Perreca v. Gluck*, 295 F.3d 215, 225 (2d Cir. 2002) (where a routine statement of projected benefits contains prominent disclaimers that the calculations therein are estimates subject to review, the statement does not constitute a "promise" in the context of a promissory estoppel ERISA claim); *Hart v. Equitable Life Assurance Soc.*, No. 02 Civ. 2364 (HB), 2002 WL 31682383, at *5 (S.D.N.Y. Nov. 26, 2002) (benefit statements containing explicit cautionary disclaimers did not constitute "material misrepresentations").[10]

---

[9] Because I find that plaintiff has failed to satisfy the material misrepresentation and detrimental reliance prongs of the test for breach of fiduciary duty under ERISA, I again do not address whether defendants were acting in a fiduciary capacity.

[10] Defendant attempts to distinguish *Perreca* on the ground that it was decided in the context of an estoppel claim, in which plaintiffs must demonstrate that "extraordinary circumstances" exist,  in addition to meeting the three prongs necessary to establish a breach of fiduciary duty by material misstatement.  However, as *Hart v. Equitable Life Assurance Society* held, a statement with explicit cautionary language will not support either an

I conclude that plaintiff has not alleged that defendants made a material misstatement or omission. The one-page Pension Statement given to plaintiff refers to the calculations contained therein as "estimates" six separate times.[11] While the Statement does provide that the "data shown on this statement reflects information currently on file," it also alerts the reader in bold lettering that "**[w]hen you retire or terminate employment, your benefit is calculated based on your actual Years of Credited Service and may be higher or lower than the amount shown**." The Pension Statement, even if potentially misleading, did not in and of itself constitute a material misstatement because it would not be reasonable to rely on such a statement without further inquiry. Further, the fact that such a statement was provided during a "safety luncheon," although undoubtedly a significant

---

estoppel claim or material misrepresentation claim because a statement containing explicit cautionary statements is not a material misrepresentation such that a plaintiff could reasonably rely on it in determining whether to retire. *Hart,* 2002 WL 31682383, at *5.

[11] Plaintiff contends that he reasonably believed that "the number set forth in the statement, which calculated Plaintiff's credits to the nearest 10,000th [decimal place], could not have been reached through a process of estimation [but rather] by using a sophisticated computer program designed to make not estimates, but highly accurate calculations." Amended Complaint ¶ 21. Plaintiff cites Black's Law Dictionary's definition of "estimate" as "[a] valuing or rating by the mind, without actually measuring, weighing or the like. A rough or approximate calculation only." (*Citing Black's Law Dictionary* 550 (6th ed. 1990)). As illustrated by the colloquial expression "garbage in, garbage out" ("GIGO"), a number may be an estimate notwithstanding the fact that a computer was involved in its calculation if the source data from which the computer began its calculation was itself inaccurate or imprecise. *See* Merriam Webster definition of GIGO, available at http://www.merriam-webster.com/dictionary/gigo. The number of decimal places alone does not refute the Pension Statement's explicit cautionary language warning that the figure was an "estimate."

event attended by plant management, does not negate the numerous conspicuous disclaimers that the Statement was only an "estimate."

Plaintiff argues that defendants breached their fiduciary duty not merely by providing him with an allegedly inaccurate benefit statement, but also by failing to affirmatively supply him with an accurate benefit statement or summary plan description despite circumstances that made the provision of accurate information particularly important, including:  (1) the greater danger of confusion about pension credits in the period immediately preceding the Plant closure when collective bargaining had resulted in a concession that employees would receive additional un-earned pension benefits; (2) SPX's awareness that work related accidents and disabling injuries are not rare; (3) SPX's knowledge that plaintiff in particular would have an interest in having accurate information concerning his potential eligibility for a disability pension due to his injury; (4) SPX's alleged preference to have employees resign rather than transfer and the conflict of interest resulting from its role as employer and fiduciary under the Plan.[12]

---

[12] The Second Circuit has held that "the simple fact that the administrator of a plan . . . happens to be 'an arm of the employer' does not in itself create a conflict of interest. . . a conflict of interest is to be 'weighed as a factor in determining whether there [wa]s an abuse of discretion [in a decision to award of deny benefits under a pension plan].'"  *Shapiro v. New York Univ.*, --- F. Supp. 2d ----, No. 08 Civ. 6538 (CM)(DCF), 2009 WL 2432329, at *12 (S.D.N.Y. Jul. 30, 2009) (citations omitted).  Plaintiff has not identified any support for the existence of a conflict aside from (1) the fact that SPX was both employer and fiduciary, and (2) SPX's alleged desire

While an employer can violate its fiduciary duty through an omission, courts have generally found an omission to be material only where an employee is given materially incomplete information in response to a question. *See, e.g.*, *Becker v. Eastman Kodak*, 120 F.3d 5, 10 (2d Cir. 1997) (noting that "[c]ourts of appeals in other circuits have held that ERISA fiduciaries must provide complete and accurate information in response to beneficiaries' questions about plan terms and/or benefits," and holding that defendant's response to plaintiff's benefits question was misleading and supported finding a breach of fiduciary duty); *Bixler v. Cent. Pa. Health & Welfare Fund*, 12 F.3d 1292, 1302 (3d Cir. 1993); *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 751 (D.C. Cir. 1990).[13] Plaintiffs have cited no case law supporting the conclusion that the failure to affirmatively provide information may constitute a breach of fiduciary duty absent a question by an employee, even where the employer is actually aware of plaintiff's interest in such information.

Here, plaintiff has not alleged that he asked defendants for any information regarding his benefits, nor has he alleged that

_____

for employees to accept the SSP and terminate their employment. Because neither has any bearing on whether a misstatement was material or whether plaintiff's reliance on such a statement was reasonable, and because plaintiff does not dispute that he did not qualify for benefits under the terms of the plan, I need not address here whether a conflict of interest existed in fact.

[13] Plaintiff has not alleged that a material misstatement or omission was made in order to induce him to accept the SSP benefits instead of continuing to work. Accordingly, I do not address whether such circumstances might constitute a breach of the duty of loyalty even absent an affirmative inquiry by an employee.

in response to any such query, defendants failed to provide a complete and accurate answer. He has also not alleged that he was impeded from obtaining further information concerning his benefits, and indeed, the Pension Statement concludes "If you have any questions concerning your estimated accrued benefit or if you believe any information is incorrect, please notify Human Resources." Am. Compl. Ex. C.[14] Accordingly, the only basis for the conclusion that defendants breached their duty of loyalty would be that defendants' awareness of plaintiffs physical condition triggered an affirmative duty for defendants to apprise plaintiff of his actual credited service for purpose of obtaining a disability pension. At the time plaintiff accepted the SSP and terminated his employment, he was not yet disabled. Following his injury, he recovered sufficiently to return to work, and continued to work at SPX for more than a month following his injury. After leaving SPX, plaintiff continued to work in a similar capacity for another employer until January 13, 2004, approximately a year and a half following the injury. Had plaintiff remained at SPX, he would have needed to continue to work for nearly a year more in order to qualify for disability pension benefits. Even assuming that a duty to provide affirmative information can arise absent a request by a plan

---

[14] Plaintiff has also stated that he was aware of the existence of the CBA, and knew that it made reference to the calculation of pension credits, although he contends that did not understand how those credits were calculated. Am. Compl. ¶ 28.

participant, these allegations concerning defendant's awareness that plaintiff had suffered an injury in the past, from which he had sufficiently recovered to return to work, do not establish that defendants knew plaintiff would become disabled long after he retired, and do not give rise a duty to provide plaintiff with information beyond that which was provided to other employees.

**B.  *Reasonable Detrimental Reliance***

Detrimental reliance on a material misrepresentation must be reasonable and in good faith in order to result in liability. *See, e.g.*, *Estate of Dermady v. Eastman Kodak Co.*, 136 F. Supp. 2d 181, 190 (W.D.N.Y. 2001).

Defendants argue that the plaintiff has not adequately pled reasonable reliance on a misrepresentation by defendants.  I agree.  Even assuming arguendo that the Pension Statement did constitute a material misrepresentation, plaintiff's allegations do not support a conclusion that he reasonably relied to his detriment on the Statement's estimate of his pension credit because, even if plaintiff had the 8.0833 pension credits reported in the Statement rather than the 7 credits he now concedes that he had in fact, he would still not have accrued the 10 credits necessary to qualify for a disability pension.

According to plaintiff, he accepted the SSP on the mistaken understanding that he had the 10 credits necessary to qualify for

a disability pension under the Plan.  Plaintiff alleges that "had
[he] known he was still one credit short, he would have rejected
the SSP and instead accepted transfer to an affiliated factory,
where he could have attempted to work until he had earned at
least one more credit."  Am. Compl. ¶ 37-38.  Under the Plan, an
employee qualifies for a disability pension only if he is
"totally and permanently disabled. . . and has his employment
terminated on account thereof at any time after having completed
ten (10) or more years of credited service."  Am. Compl. Ex B
(Plan at 19 ¶ 7.2).  The terms of the CBA modify the Plan by
providing that an employee will be credited with eighteen months
of additional credit where an employee's absence is "due to
industrial injury."  Am. Compl. Ex. D (CBA 21 ¶ 18.03(g)).
Plaintiff concedes that he did not terminate his employment at
SPX due to injury, but rather due to his voluntary resignation
and acceptance of an SSP.  Am. Compl. ¶ 37.  Accordingly, upon
his resignation, he was not entitled to the eighteen additional
months of pension credit afforded by ¶ 18.03(g) of the CBA.[15]  It

---

[15] I note that the SPX Appeals Subcommittee found that plaintiff *was*
entitled to the eighteen months of additional service credit under the CBA,
although the Subcommittee found that even with that eighteen months of credit,
plaintiff still failed to reach the 10 credits required for a disability
pension.  Because the benefit plan gives the administrator discretionary
authority to determine eligibility for benefits or to construe the terms of
the Plan, a court reviews an administrator's interpretations of the Plan under
an arbitrary and capricious standard.  *Burns*, 2009 WL 1193474, at *4, Pagan *v.
NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995); *Kinstler v. First
Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).  However, I
need not defer to an interpretation by a Plan administrator that is
"inconsistent with [the Plan's] plain words."  *O'Shea v. First Manhattan Co.
Thrift Plan & Trust*, 55 F.3d 109 (2d Cir. 1995).  Here the plain words of the

is undisputed that without the eighteen months of credit, plaintiff would not have reached the ten credits necessary to qualify for a disability pension.  Accordingly, plaintiff's decision to terminate his employment on the understanding that he had accrued 10 pension credits could not have been in reasonable detrimental reliance on the erroneous pension credit computation in the Pension Statement.

III. **Failure to Provide Defendant with a Summary Plan Description**

Plaintiff's Amended Complaint adds an independent claim based on defendants' failure to provide an SPD, in violation of Section 104(b)(1) of ERISA, 29 U.S.C. § 1024(b)(1).  Section 104(b)(1) provides that "[t]he administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes . . . within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits."

ERISA provides penalties for failure to provide plan documents in response to a specific request.  *See* ERISA § 502 (providing that a plan administrator who fails to comply with a request for any information which such administrator is required

_____

Plan compel the conclusion that employees who voluntarily quit in order to accept an SSP are not entitled to eighteen months of additional pension credit.

by [Title I] to furnish to a participant. . . within 30 days
after such request may in the court's discretion be personally
liable to such participant or beneficiary in the amount of up to
$100/day"). However, the Second Circuit has held that the
failure to provide plan documents supports a claim only where a
plan participant suffered "likely prejudice." *Weinreb v.
Hospital For Joint Diseases Orthopaedic Institute*, 404 F.3d 167
(2d Cir. 2005). A plan participant suffers likely prejudice
where he "was likely to have been harmed" by the failure to
receive an SPD, *Burke v. Kodak Retirement Income Plan*, 336 F.3d
103, 113 (2d Cir. 2003), and cannot show prejudice as a matter of
law where he had actual notice of the contents of the Plan, or
was aware of the Plan's requirements. *Weinreb*, 404 F.3d at 171-
72.

I conclude plaintiff has not stated a claim for a violation
of 29 U.S.C. § 1024(b)(1) because he received actual notice of
the relevant requirement, and because he did not suffer
prejudice.[16] Plaintiff contends that despite his awareness of
the SPD's requirement that participants must have ten credits to
become eligible for a total and permanent disability, as
summarized and amended by the CBD, he was unaware of how
credits were calculated. However, plaintiff's protestations of
ignorance are belied by the detailed allegations made in the

---

[16] *See* §II(B) *supra*, for discussion of lack of prejudice.

Amended Complaint to support plaintiff's first claim requiring

reasonable detrimental reliance on the alleged material

misstatement of the Pension Statement. Plaintiff's Amended

Complaint states that in meetings held following the announcement

that the Stockton Plant would be closing:

> 28. . .[Kenneth H. Holliday, Marley's Director of Labor
> Relations] also explained that employees would be given full
> pension credit for 2002, despite the closure, in addition to
> credits provided pursuant to the collective bargaining
> agreement. [] Plaintiff knew that pursuant to Section
> 18.03(G) of the CBA, as an employee with at least five
> pension credits he would be provided up to 18 months of
> additional credit if he became disabled "due to industry
> injury."
> 29. In light of the additional months of credit, Plaintiff
> believed he would have sufficient credits to qualify for a
> total and permanent disability pension in the event he
> symptoms "due to industrial injury" prevented him from
> working.
> . . .
> 37. Adding the eight credits set forth in the benefit
> statement that [plaintiff] reasonably believed he had,
> rather than the seven he actually had, to the additional
> full credit provided by SPX for 2002 and the maximum 18
> months of credit provided by the CBA to employees absent
> "due to industrial industry," [sic] Plaintiff believed that
> in the even he became disabled he would have at least ten
> credits, rather than nine credits, and would therefore be
> eligible for a total and permanent disability pension."

Having pled that he was knowledgeable enough about the SPD's

requirements to be able to calculate that the eighteen additional

months of credit to which he would be entitled if he became

disabled due to industrial injury (in light of his five years'

work experience),[17] would result in a credit total exceeding 10 months, I do not find plausible plaintiff's claim that he was unaware of the SPD's provision governing the calculation of pension credits.


## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted.  The Clerk is hereby directed to transmit a copy of the within to the parties and the Magistrate Judge.


SO ORDERED.

Dated:     Brooklyn, New York
           October 1, 2009


                        By: /s/ Charles P. Sifton (electronically signed)
                             United States District Judge

---

[17] Employees with less than five years' work experience receive only twelve months, rather than eighteen months, of additional credit, in the event they are absent due to industrial injury. *See* Am. Compl. Ex. D (the Plan), at 21.